83,424-01,02,03,04

To the Clerk of the Texas Court of Criminal Appeals.
   Mr. Abel Acosta

RE: File Papers: All the following is under Cert. no: 7614 1820 0001 2049 8744

   Mr. Acosta, I received ~~three~~(3) notices of the arrival of the 11.07 writs, I
Filed 4... Enclosed please find several documents that I would like to bring to the
Justices-for the Court of Criminal Appeals-attention. I believe there were lare documents
missing in my filings made to the 49th Court in Webb County Laredo, Texas. Missing
as a result of what I believe is Tampering and Interfering with my filings by the Webb
County District Attorney's Office.

   Please file with the Court. Your time and effort is greatly appreciated.
      1) ~~Request~~ Motion for order ~~to webb County~~ to produce documents; 8 pages w/ Affidavit and Exhibits:
      2) Complete and full index of filings; 4 pages
      3) Cover letter to Webb County Dist. Clerk re: File Papers dated 5.25.15 (1 page) (copy)
      4) Request for correction of Habeas Record (copy) dated 5.25.15 (1 page.)
      5) Four(4) Memo's: in Reply to State's Responses dated 5.25.15 (13 pages)
      ☞ Cause nos: 2005 CRN 630 D1(A), 2005 CRN-952 D1(A) WR NO-83,424-01, 83,424-02
            2006 CRN 441 D1(A), 2006 CRN-770 D1(A); -83,424-03, (?)
      6) Certified mail receipt no: 7013 0600 0000 5186 8427 Dated: 6.5.15
         •Return Receipt requested dated 6.8.15
         •Unit Mail Room logged 6.3.15
      •Addressed to: District Clerk - Esther Degollado
                     1110 Victoria st.(Ste.203)
                     Laredo, Tx 78042
      7) Certified receipts: 7014 1820 0001 2048 9285 w/return receipt-Attached to Index.
            7014 1820 0001 2049 5293 w/return receipt - Attached to Affidavit of Facts.
         •Proof of Purchase Post office receipts.
         •Addressed to: District Clerk - Esther Degollado
                        1110 Victoria st.(Ste 203)
                        Laredo, TX 78042
   8) Denial of Notarization.

                           Respectfully submitted, 6.17.15
                              Gabriel Cardona #1444672
                              All Reel Unit
                              2161 F.M. 369 N
                              Iowa Park, TX 76367

                  (DENIED NOTARIZATION)

ExParte Gabriel Cardona

§

§

§

§

In the 49th Judicial
DISTRICT COURT
Webb County, TX

Filed: 05.04.15;
(Resubmission to Tx.Ct.Crim.App.)

## AFFIDAVIT OF FACTS; IN GENERAL

Comes now Gabriel Cardona, applicant pro se in the above styled and numbered cause and introduces this Affidavit of Facts in General to the Honorable Court, in support of the Applications for Writ of Habeas Corpus filed for cause no's: Trial Ct. no: 2005 CRN 000630 D1, 2006 CRN 441 D1, 2005 CRN 952 D1 and 2006 CRN 770 D1. In good faith and for good cause the Applicant shows:

I Gabriel Cardona .9.13.86, being presently incarcerated in the Texas Department of Criminal Justice - Institutional Division, under inmate no: 1444672, and being competent to make this Affidavit, would show the Court, all in good faith, my understanding of the proceedings and cases, my relationships with Counsel David Almaraz and Counsel Fausto Sosa, and my decision to plead guilty.

I shall begin by saying that when I was facing these serious charges I was 18-19 years old. I had been removed from my interest in educating myself, or education, for about 3 years. I dropped out of high school as a second year sophomore, 10th grade. I began failing grades in my freshman year, 9th grade. I had been living the Laredo street life for 3 years. The Laredo slang was my vernacular, its life my life. I attended numerous Court proceedings that were continuously "reset", without anything positive ever coming out of them. All I knew was that it was "moved". The legal terms or language used was one I didn't understand. Words such as Arraignment, Indictment, record, motion discovery etc. and phrases that included those words I couldn't grasp. I did not understand the significance of "for the record". It was foreign to me. These legal terms were and are not used at all in Laredo's slang language, which is completely spanish, often spanglish, but never fully English. What I understood these terms to mean was what I actually related to them physically. For example, when you go before a judge, the charges are read, and you plead not guilty,

is what I related to the word "Arraignment". Discovery was a word that I related to nature and animals. What I watched on T.V. as a kid. Documentaries. All I knew was that you go before a judge, accompanied by the lawyers and they'll take care of everything to our best interests. That we should put all our trust and confidence in the lawyers. I thought they would automatically have our best interests at heart. As a typical ignorant adolescent, I never questioned a lawyers' say or actions in any matter. And so I appeared in numerous Court hearings which were frustrating and oppressive in a way. I had attended few juvenile proceedings, but proceedings of this kind and nature, they were a first time experience for me.

.  .  .  .  .

Understanding of case no: 2005 CRW 630 D1, Murder and Aggravated Kidnapping.

When I was arrested in June 8, 2005 I had confessed to my knowledge and participation in the failed attempted kidnapping of Bruno Orozco Juarez. I knew I had also assisted investigators into locating discarded evidence. I thought the confession was all the State needed to convict me. A co defendant and childhood friend of mine had also been arrested and charged with Murder and Aggravated Kidnapping. Richard Guerrero. There was only one conversation I had with Counsel Almaraz regarding this case. Counsel told me that I would be found guilty because I was there. I had told Counsel that I didnt provide, touch, or used the firearms nor helped in any way. That I just sat at the backseat. Counsel told me that "under the law of parties you're as guilty as the shooter." I told Counsel "even if I just sat at the backseat?", "Don't matter still guilty". Nothing was ever discussed about this case. I often asked Counsel how the case was going but "no hay nada" (there's nothing) was Counsel's all the time response. By the time I plead guilty, I had attended a meeting with Law Enforcement, D.A., and Counsel (which I'll explain shortly) and attempted to be forthcoming with them, but that meeting didn't amount to anything because I was not in agreement with how investigator Garcia was leading me to admit to something more than what the facts actually were in the case—but I hadn't realized that Counsel or I had given all the leverage to the State. I didn't make anything of it then because I refused to enter any agreement and refused to sign anything. I felt I was being used. So I thought I would get somewhere in the lower ends of sentences. Around 5-10 years. I knew my participation. I knew

what I had done and not done. I thought Counsel would come up with a good defense to get me a good deal. I was banking on the fact that he was hired to do so and is/was not a Court appointed attorney. Then my co defendant Richard Guerrero received a 10 year sentence on a reduced charge and I honestly thought I would get the same deal. We both had the same participation.

Generally I thought that murder carried the death penalty but kind of doubt it that because if for a Capital Murder you get the death penalty, then Murder had to be life. I understood that Capital Murder was when you killed a police officer. And since it was worst, I reasoned that carried death penalty, and Murder life. Although I wasn't sure. I thought a trial for murder or Aggravated kidnapping (Felony 1) and being found guilty carried an automatic life sentence, without parole. I didn't know there were ranges. I thought that if someone wanted anything lower than that, it had to be upon a plea bargain.

Understanding of case no. 2006 CRW 441 01. Murder.

When I was arrested by investigator Garcia and interrogated for this murder, I denied any involvement and gave my whereabouts on the night in question. I was arrested and charged with engaging in organized criminal activity. A few days later, the investigator went to the County Jail and charged me with the Murder. I was surprised to be charged with the Murder. I had told investigator Garcia how I had been at a Peter Pipers Pizza the night of the 7th and how later that evening I was given a ride to the bridge as I departed to Mexico. It seemed obvious to me that if he'd go to the Peter Piper Pizza and asked for the cameras he'd see that I was telling the truth. I gave him names of the people who I was with. I was told "a girl" had identified me as the shooter. About two to three weeks into my detention Counsel Almaraz was hired to represent me. He visited me and relayed how "a girl" had identified me as the shooter and as I was to explain to Counsel how that couldn't be, he quickly motioned to the phones (in the visitation area) expressing how they were being monitored. He explained or expressed to me how it was impossible going against human nature to have seen the shooter when shots are being fired in your direction. After this, nothing was ever discussed about this case. I kept trying to remind Counsel about this notion throughout my time at the county jail

but Counsel would despotically answer "that's it, its all over, she i.d. you." I didn't know anything else. All I knew was that "a girl" had identified me as the shooter. I knew it wasn't true, she was lying. Or investigator was fixing everything up against me (Investigator Garcia). I didn't know what the word "alibi" was or how it could be used in my favor. I didn't know about rebuttal. Cross examination. Had I known about the above I would have certainly helped counsel in obtaining at least affidavits but most importantly bring the witnesses to Counsel's office. I had the opportunity to do so. I bailed out. Visited Counsel twice or three times. Had I known about rebuttal, powerful as it is. I could have established that for Counsel. I would have obtained the tapes from Peter Piper Pizza that would clearly show I was there. It would clearly show that neither Jesus nor Rosalio were there. Thus it rebuts the notion that I acted with them. It shows my disengaging from them, concomitantly lending credibility. Most importantly, when I visited Counsel, Robert Camacho accompanied me. "The ride" to the bridge would be established, confirmed as being true. Even as I was later arrested, Robert Camacho visited Counsel on my behalf and was not inquired about that "ride". My fear was "the girl", I never knew her name. I didn't know she could be cross examined, vigorously, in an attempt to discredit her and belie her, attempt to impeach her, and theoretically charge her with the crime. Counsel never gave me any case files, my fear was "this girl" which I thought all the State had to do was put her on the stand and point the finger at me. Nothing to do or say to contest that. I'm toast. Life without parole. I didn't know how to defend myself against her.

When I plead guilty for the above mentioned cases, it was jury selection day. I was insistent on a trial. I saw that the D.A. confers with Counsel and then Counsel confers with me relaying the State's offer. We were in an adjoining room to the Court room. I initially declined the State's offer but I noticed how Counsel wasn't interested in that and I asked one question to Counsel "que es la defensa?" (whats our defense) "no hay nada" (we don't have any). For all this time I had been banking on the sole fact that Counsel

was hired to defend me. But I had been wary of Counsel, had been frustrated with him. So when he told me we didn't have any defense that was it for me. I didn't want anything to do with him. I plead guilty out of frustrations.

My frustrations and waryness of Counsel happened for several reasons. In the month of October we attended a Court proceeding and as I came back to the County Jail, I was taken to a room where investigator Garcia and I believe Adan were at. They relayed to me that they wanted to speak with me and I declined. I told them I had nothing to talk with them about. They told me that Counsel had an deal for me or that Counsel had made a deal with the D.A. I'm unsure. I declined to hear them. They insisted that at least to attend the meeting which would be at the Laredo Police Department, and listen to what Counsel had to say. Counsel had not told me anything about any agreement or about any meeting. Didn't mention a word. The only reason why I attended was because I thought he probably had something good in store for me. Upon arrival, investigators began with their questioning going on a case by case basis. Investigator Garcia was actually guiding me with words such as "uh-huh" "okay", "don't f-with me" when I would say something off his script. All throughout, Counsel did not utter a word of advice. He left me at the mercy of these investigators. When the murder of Noe came up (case no: 2006CRN44101), they let me speak with Counsel in private. I specifically and explicitly told Counsel I could not say I killed Noe Flores". I didn't. I can't." Counsel goes about that I had to say something and all I could bring myself to say was self-defense. Hence the absurd story of Noe setting up his own brother, that ultimately resulted in his death. That story is false. I implicated myself in the Murder of Moises and in the Murder of Jesus Resendez. When the Murder of Jesus Resendez came up I told investigators I wasn't involved in any way but investigators, Garcia mainly, was upset and threw at me how they knew that I had given so much money to this person, another, family and friends. And so I just went with it and used that for credibility purposes. I then realized something wasn't right. It all came to my senses. I immediately realized or projected in my mind that I was being used. I refused to continue and refused to

enter any agreements and/or sign anything. I didn't want to speak with them any longer. That's when I began distancing from counsel. I began to suspect of him. Then the following month I was indicted for the murder of Moises and ~~told thought~~ Counsel later withdraws from that case and the case of Jesus Resendez, and I just thought Counsel had fd me over. The less I spoke with him the better it was for me. He withdrew from those cases for financial reasons, but I had been told he was hired to represent me with all my cases. So I was just banking on the fact that he was hired to represent me. So when he told me that we didn't have any defenses my frustrations boiled. I plead. (I didn't want to complain against him because he was hired by co conspirators and thought that if I did, he would turn them against me. I felt stuck and tied to Counsel.)

.  .  .  .  .  .

My relationship with Counsel Almaraz wasn't a working relationship at all. It started off odd because as he was hired he had a verbal altercation with my brother Luis. I bailed out on March 20, 2006 and visited counsel twice possibly three times. My brother Luis had been arrested by the Federal Government and I wanted a lawyer for him. I inquired Mr. Almaraz but he respectfully declined because he was already representing a codefendant of my brother, Eduardo Carreon. He did however suggest a friend of his, Oscar Peña, and told me he (Counsel) would hire him for me. I brought Counsel the hiring money, 10k, and he directed me to later visit Mr. Peña. Upon visiting with Mr. Peña, and after learning about my brother's status. I inquired Mr. Peña if everything was good and if Counsel Almaraz had given him the full payment. He said yes. No later did I have Mr. Almaraz in my ear, mad, telling me to mind my own business and not be going around Mr. Peña's office asking questions I'm not supposed to. I was just making sure everything was okay but I guess that's not how it works with lawyers. I was arrested on seperate charges on April 11, 2006. Counsel visited me a few times but was just interested in more money. That was all he would ask me for. I would ask for the case but "no hay nada" would be Counsel's answer. There were a few times, probably three, but for sure twice when after a Court hearing, Counsel would come speak with me in the Cur-

urts holding cells and would relay to me how he had just drank a few beers with his friends through the weekend. and how they were interested in me. I asked Counsel who his "friends" were and he would state "Federal Agents." I immediately caught on to it and told Counsel to not be going around the bush and that I didn't want to hear that b/s. He was relaying to me if I was interested in becoming a Federal informant. then the "plea discussions", then him withdrawing from my other cases which I was told he was hired to represent me with. And so it was always one difference over another. I felt stuck with him because he was hired by coconspirators. We never had a working relationship.


. . . . .


Case no.: 2005 CRW 052 01. Murder. Represented by Counsel Fausto Sosa.

When I was arrested for the organized criminal activity in relation with the murder of Noe Flores. I was interviewed by investigator Richard Ramirez (name he gave me) into this Murder. I denied any involvement. I further provided investigators with information that was given to me by my then friends Jesus Gonzales and Rosalio Reta. I wasn't charged with this offense. Than the "plea discussions" in which I implicated myself; then I was Indicted the following month of November. which was really uneventful. This case overall was non existent. this case was never discussed between Counsel Sosa and I. Not once. It was all about the Resendez case. I was somewhat confused because I had implicated myself in the "plea discussions" and thought it would be used against me. I didn't know plea related statements that did not result in a plea were inadmissible. I somewhat doubted the relevancy of those admissions because I refused to sign anything but wasn't sure. In the back of my mind lay what investigators had told me that David, Pablo and Juan were implicating me. I saw them in the indictment but was completely unaware of the extent of their statements. I thought, sure they'd see me around. in their houses, but nothing more. I didn't know they were actually saying I was part of their squad. which I was not. Their leader. Lucio Velez Quinteros. and I didn't like each other. How am I going to be part of their group. One thing is to be friends with Jesse and Rosalio. (I grew up with them, since childhood) and another thing to be part of their group going around committing murders. In the end, when I plead guilty. all the talks with Counsel were about the Double homicide. and when Counsel told me that my

federal time would be concurrent. This case was lumped with the other ones. But I did not know absolutely anything about this case.

2006 CRN 720 D1. Murder. Represented by Counsel Fausto Sosa.

I was arrested for this Murder on April 11, 2006, after a house I was staying at was raided by multiple agencies in relation to a federal investigation. I along with other "suspects" were taken to the Laredo Police Dept. for questioning. Raul Jasso a co defendant. was also taken. When I was told that I would be charged with the double homicide. I vehemently denied it. I was adamant and pissed off at investigators for wanting to charge with me with just about any murder happening in Laredo. I was continuosly and verbally harrassed by investigator Guzman. I kept insisting him to call my lawyer. I showed him my attorney's card and told him to call him if he wants to speak with me. He kept refusing and didn't seem to understand what: if you want to speak with me call my lawyer. meant. After repeated attempts, I was finally left alone. I did not speak with them at all. After a few hours I hear that my girlfriend at the time. Christina Lozano. was brought in. I heard how investigator Guzman asked her several times to release information to which Christina would repeatedly answer "I don't know what you're talking about, I don't know anything". I then hear investigator Guzman begin harrassing her endlessly. Calling her all types of expletives: "pendeja, no te hagas pendeja" etc. Christina broke down and crying told him she didn't know anything. Investigator Guzman didn't leave her alone and I just couldn't take it. I banged on the wall as hard as I could and yelled a cuss word at investigator Guzman. And he came rushing into my room and I told him to leave her alone. She's not involved in anything and to stop trying to make her say something she doesn't know. He put his middle finger in my face and I was moved to a seperate room. Investigator Guzman didn't seem to give a damn about the fact that Christina Lozano was still a minor... I was arrested and charged with the double homicide because Raul Jasso had confessed to it and implicated me. That's all I knew about the case. I didn't know about the accomplice witness testimony rule. I didn't know about impeachment. How codefendants were always impeached. Cross examination. I wasn't concerned about Christina. I saw her in the indictment listed as a witness. I wasn't aware how the State would attempt to corroborate Jasso's testimony through her. Although it wasn't my concern because I knew how and why she co-

me upon making those statements. But Counsel never explained to me the co-roboration process. Counsel never interviewed Christina. (Christina wasn't even interested in the State's cause. Investigator Garcia had gone to her house in an attempt to interview her, but Christina refused and called Mr. Almaraz, counsel, asked for advice and investigator Garcia left.) On the contrary, he bumped into her and her mother Mabel outside Luby's cafeteria and implied to her that she should stay away from me. My main fear was Raul Jasso. This was material in my decision to plead guilty. I didn't know I could contest whatever he was saying. He was impeachable. Something I didn't know. The only thing that Counsel relayed was that I would be found guilty right off the bat. Because of Jasso and my prior convictions. That was it. He never explained anything else. ————

My decision to plead guilty for the above cases came down ultimately to the fact that I wanted peace of mind. I was told that I would get federal time and that it was already agreed that my federal time would run concurrent. Knowing that, I was at peace accepting a plea bargain, in 30 years I would be out and all this would be over. I was at peace knowing that I would have a second chance. The past year had been heavy on me. I didn't know what the hell was going on. I was stressed. For all the above, not knowing any defenses, laws, etc. there was a lot of uncertainty. I was still insistent on a trial. I wasn't just going to plead to something I didn't do. But when Counsel told me that I would be indeed picked up by the feds, and since my time would be concurrent, I just plead guilty. Little did I know, and Counsel never told me, that because of these pleas I would be charged multiple times, for each plea, in Federal Court. Be extremely prejudiced and be at the very end of the Federal Sentencing Guidelines and at the very bottom of it as well. Life! Both Counsels knew that.

My relationship with Counsel Sosa never developed. We spoke for the first time about over a month or two after he was appointed by the Court. It was brief. It seemed to me that he was analyzing me. I was already wary of lawyers because of Almaraz, and Sosa didn't even make any attempt to

ensure me that he was there to help me either. I asked him if he knew Christina Lozano but he was quick to change the subject. I just wanted to know why he made those comments to her. What made me suspect or distrust Counsel and learn that he wasn't going to help me was the fact that he threw at the table in front of me a picture of the deceased Jesus Resendez. He wanted me to touch it. This same exact act was done by the investigators, which I refused to grab or touch simply because I don't touch anything in the possession of the Laredo Police Department. But when Counsel did this I realized it was for a totally different reason. I grabbed it, looked at it, and gave it back to Counsel. The other visits were mainly, and entirely actually, about pleading guilty and the State's offer. All which I declined, Refused. Counsel visited me about three times maybe 4 times total. So we never developed a working relationship. It didn't help that he volunteered to be Court Appointed Counsel.

I understand that it is not enough for me to just claim "I'm innocent". But I wholeheartedly believe that God's justice manifests itself through a jury's verdict. And I have been attempting to do that or obtain that through the withdrawal of the guilty pleas—which were not entered freely, knowingly, intelligently and voluntarily—and proceed to a trial by jury. I have been trying to obtain relief since day 1, February 12, 2007, the same day I plead guilty. When my sister in law helped me with a three way call to Counsel wherein I left a message to Counsel and requested him to withdraw the plea. I have sent letters to and requested documents from the District Clerk. Since 2007. I have sent a letter to the Innocence Project (2008) I sent a letter to the 4th Cir. Court of Appeals in 2009 requesting appellate counsel. I sent Counsel Almaraz a letter requesting case files. All to no avail. My endeavors to justice are sincere.

Although I am not raising a conflict of Interest claim. I would like to point out the following facts which show that Counsel was not acting as Counsel guaranteed by the sixth amendment. A conflict of Interest is accordingly plausible. (I am also shocked that Counsel Almaraz did this to me. I caught on to it, I wholeheartedly believed I was being used, and which is why those plea discussions stalled, but I just didn't know much and consequently all the leverage was given to the State) The fact that Counsel did not conduct meaningful adversarial challenge. Didn't secure my constitutional rights i.e. double jeopardy.

the fact that Counsel did not file a Motion For discovery for cause no: 2005 CRW 636 01 A). The fact that Counsel engaged in whatever agreements with the State without my consent. I never implied, suggested, or indicated to Counsel to do so. The fact that the entire version of the facts of all the cases were changed entirely. In the Murder of Bruno Orozco, it went from 47 Eric Ivan Martinez being the man directing the offense to being replaced by me. Contradicting everything I had initially stated truthfully in my confession. Not only is it making me look like a liar, it is also giving the State all the leverage. In the case no: 2006 CRW 411 01(A), I told Counsel I did not kill the guy, I couldn't say I did. The fact that Counsel told me I had to say something. The fact that Janet Pineda did not even identify me as the shooter or of even seeing me, evidenced by the testimony she made gave in Federal Court. Thus, had Counsel interviewed her, Counsel would discover the same. What Counsel would thus send his client to the guillotine? Counsel could have moved to exclude or suppress that id. The synopsis alone is suspect. For cause no: 2005 CRW 852 01(A), the fact that Counsel did not give sand advise to his client "hey Gabriel I'm not representing you with that case, you have not been formally charged nor arrested".., but instead left his client at the mercy of investigators. His client thus implicated himself and again sent to the guillotine. For cause no: 2006 CRW 711 01 A), the fact that his client stated he had nothing to do with the offense and thereupon investigators come with extraneous matters, irrelevant, and Counsel didn't offer any meaningful advise "hey, hold on just a minute, he's telling you he's not involved that evidence you mention doesn't prove anything, at best, it concerns irrelevant extraneous matters." And yet again, his client is sent to the guillotine. Then the following month Counsel conveniently withdraws from those two cases. For all the cases, the facts have now changed dramatically. Now, Gabriel Cardona was the leader, the man directing these murders. The one in constant contact with the leaders in Mexico. Who was working behind the scenes? Mr. Almaraz knew I had an active Federal Investigation, Counsel wanted me to become a informant. Counsel had been a former federal prosecutor. Counsel's "federal agents" friends. I wholeheartedly felt I was being used. Counsel used me for the federal government. The federal government was working a "Travel Act" indictment. Counsel knew. He told Christina Lozano and Robert Camacho that why worry about me if I was going to be picked up by the Feds. All these cases, which enhances the single drug trafficking and prejudices defendants, involving now

the violence, as evidenced by these offenses. But the government needed the point man, the one in constant contact with the coconspirators and big wigs in Mexico. The one who would make the violence element stick like glue. They did not have one. The one who could do that, who would tie directly Miguel Trevino, or the big wigs allegedly, to the murders, and the only one who could do so was Lucio Velez Quintero! But he was gone. Let go by incompetent investigators. Now, all they had left was third party testimony, at best. They needed a point man. And they found one in a lawyer's client who's lawyer was worried after being hired by coconspirators. (I attended a Court hearing where I was asked by the Honorable Lopez about who had hired Mr. Almaraz. I plead the fifth after being alerted about the coming questioned and advised to do so.) Indeed. The narrative that the Federal Government and Investigator Garcia put out there is one and the same: Gabriel Cardona, the leader of a squad of hit men. who oversaw 5 killings. Where does it come from? Is it accurate? Is it actually and factually correct? If not, then why did Mr. Almaraz, a former federal prosecutor engage me to change the entire facts to the governments favor and to my detriment? (It is the same narrative to the media: See: Laredo M. Times: DATES: 3.1.09, 3.6.09, 5.20.09; Houston Chronicle: "Drug Cartel hires teens as border hitmen" By Susan Carroll 4.15.07; Details: 6.09 issue "Young Guns"; New York Times:"... Cartel Lure Amer. teens as killers" by James Mckinley 6.23.09 )(Although I attempt to set the record straight, the Media publishes what they want. If it bleeds it leads.) Where does it all come from? Straight from those plea discussions. Why did I attend? Engage? Because I was operating under misconceptions. (See all the above). Thank God I caught on to it. For what it is worth I do not know. But I show the Court how I was affected and why I plead guilty.

   In all fairness and equality, the jurisprudence of the Criminal Justice System. I respectfully request fairness where fairness is due, and an opportunity to establish innocence where innocence is due. God Bless Your Honorable Court.

   True, accurate and correct, to the best of my memory. under penalty of perjury.

                    Respectfully subm.: Gabriel Cardona #1444672 (pro se)
                    All Red Unit
                    2101 F.M. 369 N.
                    Iowa Park, TX 76367

# § LEGAL MEMORANDUM §

To be Constitutionally valid, a guilty plea must be made on a "voluntary" and "intelligent" basis. Bousley v. U.S. 523 US 614, 618 (1998); Brady v. U.S. 397 U.S. 742, 748 (1970). A guilty plea is not intelligent and therefore is constitutionally invalid if a defendant "had not been aware of the nature of the charges against him, including the elements of the ... charge to which he pleaded guilty. Bradshaw v. Stumpf, 545 U.S. 175, 182-83 (2005) (emphasis added). Due Process clause requires that a guilty plea be made on an intelligent basis. See Smith v. O'Grady, 312 US 329, 334 (1941): See also Henderson v. Morgan, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed. 2d 108 (1976); Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed. 2d 274 (1969). For a guilty plea to be valid normally it must have a basis in fact, and the defendant must admit to that basis in fact. See U.S. v. Plisek 657 F.2d 920, 924 (7th Cir. 1981) (emphasis added); U.S. v. Johnson, 612 F.2d 305, 309 (7th Cir. 1980). In order to enter a valid guilty plea, a defendant also must possess an understanding of "the law" in relation to the facts." McCarthy v. US. 394 US 459, 466, 89 S.Ct. 1166, 1171 22 L.Ed. 2d 418 (1969); Nash v. Israel, 707 F.2d 298, 302 (7th Cir. 1983) (emphasis added). This means that a defendant must understand not only the nature of the charge against him but also that his conduct actually falls within the charge. McCarthy, supra, at 394, US 467, 89 S.Ct. at 1171. (emphasis added). Before, pleading guilty a defendant should be made aware of possible defenses, at least where the defendant makes known facts that might form the basis of such defenses [such as a confession that provides an understanding of a defendant's culpable mental state or lack thereof] See Sober v. Crist, 644 F.2d 807, 809 n.3 (9th Cir. 1981) (emphasis added); Thundershield v. Solem, 565 F.2d 1018, 1028 (8th Cir. 1977). A valid guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." N.C. v. Alford, 400 US 25, 31, 91 S.Ct. 160, 164, 27 L.Ed. 2d 162 (1970). The assistance of counsel received by a defendant is relevant to the question of whether a defendant's guilty plea was knowing and intelligent in so far as it affects the defendants knowledge and understanding. See McMann v. Richardson, 397 U.S. 759, 770-71, 90 S.Ct. 1441 48, 49, 25 L.Ed. 2d 763 (1970); Sierra v. Gov. of Canal Zone, 546 F.2d 77, 81 (5th Cir. 1977).

Justice Sutherlands opinion for the Court in Powell v. Alabama, 287 US. 45, 77 L.Ed. 158, 53 S.Ct. 55, 84 ALR 527 (1932):

"The right to be heard would be in many cases of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he may have a perfect one. He requires the guiding hand of Counsel at every step in the proceedings against him. Without it, though he may be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such refusal would be a denial of a hearing, and, therefore, of due process in the Const. sense." id. at 68-69, 77 L.Ed. 158, 53 S.Ct. at 84. (emphasis added)

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Justice Central District Clerk
Esther Degollado-Clerk
1110 Victoria St. Ste 203
Laredo, TX 78042

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____

□ Agent
□ Addressee

B. Received by (Printed Name)    C. Date of Delivery

MAY 04 2015

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        ☒ No

3. Service Type
   ☒ Certified Mail®    □ Priority Mail Express™
   □ Registered         □ Return Receipt for Merchandise
   □ Insured Mail       □ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    □ Yes

2. Article Number
   (Transfer from service label)

7014 1820 0001 2049 5293

PS Form 3811, July 2013    Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

LAREDO, TX 78042

OFFICIAL    USE

| | | |
|---|---|---|
| Postage | $ 1.47 $0.91 | 0077 |
| Certified Fee | 3.30 $3.30 | 02 |
| Return Receipt Fee (Endorsement Required) | 2.70 $2.70 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ 7.47 $6.91 | |

Sent To                                05/01/2015
Justice Central District Clerk
Street & Apt. No.,
or PO Box No. 1110 Victoria St. Ste 203
City, State, ZIP+4
Laredo, TX 78042

PS Form 3800, July 2014        See Reverse for Instructions

7014 1820 0001 2049 5293

IOWA PARK
211 E CASH ST
IOWA PARK
TX
763679998
05/01/2015    (800)275-8777    9:01 AM

| Product Description | Sale Qty | Final Price |
|---|---|---|
| First-Class Mail Letter (Domestic) (LAREDO, TX 78042) (Weight:0 Lb 2.70 Oz) (Expected Delivery Day) (Monday 05/04/2015) | 1 | $0.91 |
| Certified (@@USPS Certified Mail #:70141820 000120495293) | 1 | $3.30 |
| Return Receipt | 1 | $2.70 |
| Affixed Postage (Affixed Amount:$7.00) | 1 | ($6.91) |

"Affidavit of Facts"

| Total | | $0.00 |

For tracking or inquiries go to USPS.com or call 1-800-222-1811.

Order stamps at usps.com/shop or call 1-800-Stamp24. Go to usps.com/clicknship to print shipping labels with postage. For other information call 1-800-ASK-USPS.

*****************************
Get your mail when and where you want it with a secure Post Office Box. Sign up for a box online at usps.com/poboxes.
*****************************

All sales final on stamps and postage Refunds for guaranteed services only Thank you for your business

HELP US SERVE YOU BETTER

Go to:
https://postalexperience.com/Pos



# Full and Complete Index of Filings

Date: 4.30.15 (Expected delivery date ; Confirmed by Post Office)
Weight: 3 lbs 5.70 oz
Cert. receipt #: 7014 1820 0001 2048 9285
5-(Five) Sealed Envelopes in 1 package. (All sealed envelopes were addressed to the Clerk)

Envelope #1 - Writ of HABEAS CORPUS (28-30 pgs)
   Trial Cause no: 2005 CRN 630-D1
   Murder and Agg. kidnapping
   Grounds: Double Jeopardy; I.A.C- Failure to Conduct Meaningful Adversarial Challenge; Failure to Explain the True NATURE OF THE OFFENSE i.e. Elements; Failure to fully explain the law of Parties; Failure to advise of an Affirmative "lack of knowing or intent" defense...; ill equipped and unprepared Counsel; Unknowing and Unvoluntary plea; Invalid Plea; Cumulative error; Failed to explain a nature of trial.

• Memorandum of Law in support of writ. Cited authority and provided argument in support of points of argument. (15-18 pgs)
• Attachment to Memorandum of Law; Applicant's confession redacted dated 6.08.05 (13 pgs.)
• REQUEST FOR EVIDENTIARY HEARING - (5 pages.)
   Total page count: About 68 pages.

Envelope #2: Writ of Habeas Corpus (30 pgs.)
   Trial Cause no: 2006 CRN 441-D1
   Murder
   Grounds: I.A.C- Failure to Investigate and interview witnesses; David Utz. Pablo Gonzales. Juan Apolinar W. Gabino Chavez; Failure to interview eyewitness Janet Pineda; Failure to investigate and interview Christina Lozano; Failed to establish an affirmative defense theory; Failed to investigate and establish an alibi defense; Ill equipped unprepared Counsel; Failed to explain the true nature of the offense; Unknowing and involuntarily plea. invalid plea; Cumulative error; Actual innocence. Total of _10 grounds._ (

• Memorandum of Law in support of writ; Cited authority and provided argument of how a trial would be altered had Counsel done all the above. (18 pgs.)
• Production of Witnesses Statements; (Synopsis) interviews of
                          -Gabino Chavez from where in v.s learned
                           of Lucio Velez Quintero      (copy's)
                          - David Martinez Cerezo
                          - Pablo Gonzales Perez
                          - Juan Apolinar Quiroga Garcia
                          · Janet Pineda
                          - Christina Lozano      (Total: 8 pgs)
• Production of Newly Discovered Evidence; (In support of Actual Innocence claim)
                          - Testimony in Federal Court by Janet Pineda  (copy)(4 pgs.)
                          - Testimony in State Court by Christina Lozano (copy)(4 pgs)
• Motion for Evidentiary Hearing. (5 pgs.)
   Total page Count: About 70 pgs.

Envelope #3: Writ of Habeas Corpus (32-34 pgs total)
  Trial Court Cause no: 2005 CRN 952 D1
  Murder
  Grounds: I.A.C. Failure to investigate and interview witnesses: David Mtz. Pablo Gonzales; Gabino Chavez. Juan Apolinar Quiroga Garcia.; Failure to investigate Facts; Failure to ~~investigate~~ produce a "botched inv's" defense; Failure to inv. circumstances; Failure to inv. and interview Christina Lozano; Failure to explain the true nature of the offense i.e. law of parties; Failure to explain the right to and nature of a jury trial; False promise and faulty advice; Induced plea I.A.C; Induced plea by the State; Fundamental Error by the Court; Invalid Plea; Cumulative error. Total of: 13 grounds.

- Memorandum of Law in support of Writ. Provided authority and argument of how the trial would be altered had Counsel done all the above. (19 pgs.)
- Production of Witnesses Statements. Interview Synopsis' of:                    (1 pg.)
                                   - Gabino Chavez w/ the learning of Lucas Velez Quin-ten.
                                   - David Martinez Cerezo (2 pgs)
                                   - Pablo Gonzales (1 pg.)
                                   - Juan Apolinar Quiroga Garcia (1 pg.)
                                   - Christina Lozano (1 pg.)
- Testimony Given in State Court by Christina Lozano (4 pgs.)
- Testimony Given in Federal Court by David Mtz. Cerezo ⟩ In support of what Counsel would've discovered. (5 pgs.)
- Excerpts in support of Applicants argument/claim re: Federal Sentence (3 pgs.)
                          - Excerpts of Plea Agreement
                          - Excerpts of Judgment
                          - Excerpts of Docket re: Requesting Appellate Counsel
                                       letter dated August, 2009; Mailed to Court of Appeals; forwarded to the 49 District Court.

- Motion for Evidentiary Hearing. (5 pages)
Total page Count: <u>About 75 pages.</u>

- - - - - - - - - - - - - - - - - - - -

Envelope #4: Writ of Habeas Corpus (33 pgs.)
  Trial Cause no: 2006 CRN 770 D1
  Murder
  Grounds: I.A.C. Failure to explain the nature and cause of accusation i.e. accomplice witness rule; Failure to inv. and interview Christina Lozano; Conflict of Interest; Failed to explain the right to and nature of a jury trial; Faulty advice and False promise by Counsel; ~~Induced~~ Cumulative error; Induced plea by Counsel; Induced plea by State; Fundamental error by Court; Invalid Plea; Abuse of Rule of Lenity. Unknowing and Unvoluntary plea. (12 grounds)
- Memorandum of law in support of writ; Cited authority and argument. (15 pgs.)
- Excerpts in support of points of argument re: Federal Sentence
                          - Excerpts of docket: rejected offer by def. )(1 pg.)
                          - docket requesting appellate counsel; letter forwarded to the Court by the Court of Appeals dated Aug. 2009. (1 pg.)
                          - Excerpts of plea agreement (1 pg.)
                          - Excerpts of Judgment. (1 pg.)                2 of 4

- Motion for Evidentiary Hearing (5 pgs.)

Total page count about 100 pgs.

- - - - - - - - - - - - - - - - - - - - - -

Envelope number 5.
- In General Motion for Bench Warrant 3 pgs. w/ Exhibits
  - Exhibit: 2 pgs of "Mail being opened."
  - Grievances (2) - Complaints of ↑

- In General Request For Due Credibility of Claims. w/ Exhibits
  - Explained the delay and reasons thereto and forthwith.
  - Explained how I have been attempting to obtain relief.
    Exhibits:
    - Letters to and answers from District Clerk w/ documents requested
    - Letter from Innocence Project (2008)
    - Card from State Counsel for Offenders (2009)
    - Plea Agreements Exhibits 1 and 2 (States)     2005 CRW 630 D1
                                                      ^ 2006 CRW 441 D1

I explained how the wording in item 13 of the Plea Agreements was wrong, significantly altering the agreement and how Counsel didn't notice it and scratched it off to correct it. Thus if he corrected the wording in the initial pages and not the item 13, then does it prove and show that Counsel did indeed go through the agreement item by item? If so then why didn't he correct the wording. If not, then how did I know or rather, how could I then be expected to know what the agreement is. Which undermines the plea agreements...

    - Exhibits of Step 1 and 2 grievances and how since 2010 this Unit has consistently denied me access to the Law Library
    - I also explained how I have been constantly pulled on Federal Bench Warrants and for a total of 20 mts. In County's with either no Law library's or ill equipped library's. Something I'm unaware of.
  Total page count: About 57 pgs.

All five envelopes which were sealed, consist of about a total of 330 pages! All five envelopes have a total weight of 3 lbs. 5.70 oz. Received by the Iowa Park Post-Office on 4.28.15;
  The Honorable's Secretary relayed to my brother of just receiving "13 pages"! A lot of documents are missing.

- - - - - - - - - - - - - - - - - - - - - -

Date: 05.04.15 (Expected delivery date 5.04.15; Confirmed by Post Office)
Weight: 0 Lbs. 2.70 oz
Cert. receipt no: 7014 1820 0001 2049 5293
1 sealed envelope w/ letter.
  12 page Affidavit of Facts In General; Explaining of my relationship with Counsels Almarar and Sosa. how I was affected and why I plead guilty.

• 2 pages Explaining to District Clerk of the filings and wrote in detail all filings. Explained to notify me if anything is missing.

Total page count 14-15 pgs.

Return Receipt requested was signed and stamped dated 05.04.15. Proof of delivery.

The Honorable's secretary states they did not receive such letter!

Iowa Park Post office received the package on <u>05.01.15.</u>

- - - - - - - - - - - - -

On 5.25.15, I again filed a Request for Correction of Habeas Record. (Enclosed)

On 5.29.15, I received a State's Response (4). A total of 28 pages. Not stamped as filed and without writ #. _____

On 6.5.15, by proof of certified receipt no: 7013 0600 0000 5186 8427, I mailed 4 memorandum of reply to the States Responses. (enclosed)

As of this the 15th day of June. I have received 0 response from the Clerk!

True, accurate and correct, to the best of my abilities.

Respectfully submitted,
Gabriel Cardona #1444672
All Red Unit
2101 F.M. 369 N.
Iowa Park, TX 76367

6-15-15

## U.S. Postal Service™
## CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

| | | | |
|---|---|---|---|
| Postage | $ 10 $9.00 | | 0077 |
| Certified Fee | 3 $3.30 | | 02 |
| Return Receipt Fee (Endorsement Required) | 2 $0.00 | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | | |
| Total Postage & Fees | $16 $12.30 | | |

Sent To
ESTER DEGOLLADO - DIST. CLERK
Street & Apt. No., or PO Box No. 1110 VICTORIA ST. STE. 203
City, State, ZIP+4 LAREDO, TX 78042

PS Form 3800, July 2014    See Reverse for Instructions

7014 1820 0001 2048 9285

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ESTER DEGOLLADO CLERK DIST
1110 VICTORIA ST. STE. 203
LAREDO, TX 78042

PS Form 3811, July 2013    Domestic Return Receipt

2. Article Number: (Transfer from service label)
7014 1820 0001 2048 9285

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☒ Certified Mail®    ☐ Priority Mail Express™
☐ Registered         ☐ Return Receipt for Merchandise
☐ Insured Mail       ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)    ☐ Yes

IOWA PARK
211 E CASH ST
IOWA PARK
TX
763679998
04/28/2015    (800)275-8777    9:12 AM

| Product Description | Sale Qty | Final Price |
|---|---|---|
| PM | 1 | $9.00 |

(Domestic)
(LAREDO, TX  78040)
(Weight:3 Lb 5.70 Oz)
(Expected Delivery Day)
(Thursday 04/30/2015)

| Certified | 1 | $3.30 |

(@@USPS Certified Mail #:70141820
000120489285)

| Affixed | 1 | ($12.30) |

Postage
(Affixed Amount:$14.21)
(writs, Memo, statements, testimony etc.)

| Total | | $0.00 |

For tracking or inquiries go to
USPS.com or call 1-800-222-1811.

Save this receipt as evidence of
insurance. For information on filing
an insurance claim go to
usps.com/ship/file-domestic-claims.htm

Order stamps at usps.com/shop or call
1-800-Stamp24. Go to
usps.com/clicknship to print shipping
labels with postage. For other
information call 1-800-ASK-USPS.

*******************************************
Get your mail when and where you want
it with a secure Post Office Box. Sign
up for a box online at
usps.com/poboxes.
*******************************************

All sales final on stamps and postage
Refunds for guaranteed services only
     Thank you for your business

     HELP US SERVE YOU BETTER

          Go to:
https://postalexperience.com/Pos



TO THE WEBB COUNTY DISTRICT CLERK
　　ESTHER DEGOLLADO

RE: FILE PAPERS

Ms. Degollado,
　　　Enclosed please find a request for correction of habeas record. Could you please file it under its pertinent cause no. I have not received a response what-soever notifying me of the arrival of my Habeas Corpus Applications and I do not have their corresponding Habeas Corpus record cause number. This request is in general form. Please file with the correct Court, please.

NOTE: I sent two seperate pieces of mail, certified, which consisted of 4 habeas corpus applications, and an affidavit of facts.

Cert receipt no: 7014-1820-0001-2048-9285 - Applications; Memo of Law; Affid. Testimony etc.
　　　- 7014-1820-0001-2049-5293 - Letter notifying you of the mailing of the above cert. mail and an affidavit of facts in general form.

Dates of Delivery: Thursday 04/30/2015; Monday 05/04/2015

　　　Please notify me.　Your time and effort is greatly appreciated.

　　　　　　　　Respectfully submitted, Gabriel Cardona #1444672
　　　　　　　　05/25/15　　　　All Red Unit
　　　　　　　　　　　　　　　2101 F.M. 369 W.
　　　　　　　　　　　　　　　Tower Park, TX 76367

　　　　　　　　　　　　　　　　　　　　5-24-15

EX PARTE CARDONA

Cause no: _____

§    IN THE 49th JUDICIAL
§    DISTRICT COURT
§    WEBB COUNTY. TEXAS
§

## REQUEST FOR CORRECTION OF HABEAS RECORD

Comes now Gabriel Cardona, applicant pro se in the above entitled and numbered cause and makes this request for correction of habeas record as follows:

I.

Any and all references made with respect to applicants Federal case referred to as a "RICO ACT" case should stand corrected as a "TRAVEL ACT" case or Interstate Travel and foreign Commerce in Aid of Racqueteering. Applicant was indicted under the TRAVEL ACT in Federal Court and not under the "RICO ACT".

II.

Applicant made an honest mistake under the misconception that all racqueteering cases are under the RICO ACT. Made references on Habeas applications and affidavit of facts.

WHEREFORE applicant requests that the Habeas Corpus record be corrected in this respect. i.e. delete RICO ACT for TRAVEL ACT.

Respectfully submitted.

Monday May 25, 2015 - Gabriel Cardona #1444672
All Red Unit
2101 F. M. 369 N.
Iowa Park, TX 76367

5-24-15

## NOTICE
## OFFENDER NOTARY PUBLIC SERVICE

Under both Federal law (28 U.S.C § 1746) and State law (V.T.C.A. Civil Practice & Remedies Code, §132.001-132.003), offenders incarcerated in Texas may use an unsworn declaration under penalty of perjury in place of a written declaration, verification, certification, oath, or affidavit sworn before a Notary Public.

In a request for Notary Public service, each offender must explain why an Unsworn Declaration is insufficient before Notary Public service will be provided.

********************************************************************************

*An example of an unsworn declaration pursuant to State law is as follows:*

"My name is __Gabriel__ __—__ __Cardona__ my date of birth is __9.13.80__,
          (First)      (Middle)      (Last)

and my inmate identifying number, is __1444692__. I am presently incarcerated in

__All Red Unit + T.O.C.J__ in __Iowa Park__
          (Corrections unit name)                              (City)
__Wichita__   __Texas__   __76367__. I declare under penalty of
     (County)        (State)        (Zip Code)

perjury that the foregoing is true and correct.

Executed on the __17th__ day of __June__, 20__15__. _____ "
                                                              (Offender Signature)

********************************************************************************

*An example of an unsworn declaration pursuant to Federal law is as follows:*

I _____(insert offender name and TDCJ number), being presently incarcerated in _____ (insert TDCJ unit name), in _____County, Texas, declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____ day of_____, 20___. _____ "
                                                              (Offender Signature)

********************************************************************************

## NOTICE
## NOTARY PUBLIC SERVICE DENIAL

Regarding your request for Notary Public service, insufficient justification was provided necessitating Notary Public service. However, you may proceed with an Unsworn Declaration.

__[Ms. Haney] - Did not sign!__          __6.17.15__
     (Signature - Notary)                              (Date)

I was denied notarization of these documents. Given this form.

1 of 1